JULIA GUTHRIE v. GREAT NORTHERN RAILWAY COMPANY.

May 17, 1899.

Nos. 11,586—(109).

**Death by Wrongful Act—Contributory Negligence—Evidence of Wilful Negligence of Engineer.**

In an action to recover damages for the death of plaintiff's intestate, caused by the alleged negligence of defendant's engineer, *held*, that the evidence was conclusive that the deceased himself was guilty of contributory negligence; also that there was no evidence that the engineer was guilty of wanton or wilful negligence in failing to exercise reasonable care to avoid injury after he discovered that the deceased was in a place of danger.

Action in the district court for Stearns county by the administratrix of the estate of Archie Guthrie, deceased, to recover $5,000 damages resulting from the death of decedent. The case was tried before Searle, J., and a jury, which rendered a verdict in favor of plaintiff in the amount demanded. From an order denying a motion for judgment notwithstanding the verdict, or for a new trial, defendant appealed. Reversed.

*Wm. R. Begg,* for appellant.

*Calhoun & Bennett,* for respondent.

MITCHELL, J.[1]

The deceased was a brakeman on a freight train of the defendant running between Hinckley and St. Cloud, on what is known as the "Hinckley Branch." One Gallagher was engineer on the same train. This train made the round trip every day except Sunday. Both the deceased and Gallagher had been running on it sufficiently long to become familiar with the route. At the station of Bridgman there was a spur called the "Mill Track," upon which the trainmen had frequent occasion to go for the purpose of putting in or bringing out freight cars. The evidence will be better understood by reference to the map on page 278.

[1] BUCK, J., absent, took no part.

On the day in question the trainmen had occasion to go in on the spur track to bring out some loaded cars. At station O this track divides into two branches, and the cars in question stood on the westerly branch, at a point variously estimated by the witnesses from 150 to 240 feet beyond the point marked "Crossing," where the deceased was struck, as hereinafter stated. The engine and tender were backed in onto the mill track, Gallagher acting as engineer, the deceased riding on the gangway of the engine. Another brakeman was "on the hind end of the tank," but where the engineer could not see him. When they approached the switch (station O), the engine was stopped or "slowed up," and the deceased got down from the engine, and ran ahead, and threw the switch, signaled the engineer to "back up," and then started up the track on a run, for the purpose of coupling the cars when the engine and tender reached them. There is a conflict in the evidence as to whether, between the switch and the crossing (a distance of about 150 feet), the deceased ran between the rails, or along and outside of them, on the westerly side of the track. The engineer and one of the bystanders testified that he ran outside the rails (although the bystander was not at all certain), while another bystander testified that he ran between the rails. Between the switch and the crossing it would have been difficult to walk outside the rails, because there was no "shoulder" to the roadbed, but from the crossing northward it was practicable to walk or run outside the rails far enough to avoid danger from the passing tender or engine. The tender, being considerably wider than the track, projected on each side quite a number of inches beyond the rail.

Upon receiving from the deceased the signal to back up, the engineer started back, and by the time the crossing was reached the engine had attained a speed of seven or eight miles an hour. One witness, who was a locomotive engineer, testified that, in his opinion, the usual and customary rate of speed in backing down, under the circumstances existing in this case, would be not over three or four miles an hour, but there was no evidence as to the usual rate of speed at which this or any other train had been accustomed to back down on this spur. While the engineer was backing up in response to the signal of the deceased, he was look-

ing out of the westerly cab window back in the direction in which he was moving, watching the deceased, and continued to do so until after the latter reached the crossing. This he admits was his duty, under such circumstances, for the double purpose of protecting the brakeman and of watching for signals from him to guide his movements. The bell was rung continuously while the engine was being backed up to the time of the accident.

We come now to the evidence as to what occurred at the immediate time when the accident happened. The engineer testified that the deceased ran up to where some men were standing quite close together, at or near the crossing, and stopped and spoke to them. Here we will use his own language:

"Q. Then you saw him leave the men? A. I saw him leave the men, and start back. Q. When he left the men, what did he do? A. That is the last I saw of him. Q. You saw him start away from the men? A. Yes, sir. Q. And then he disappeared? A. Well, I reached in to start the engine back,—gave her steam to start to couple onto the cars,—and was looking back like that, and the next thing I heard was a yell. I reached in and shut off, and set the air, and stopped as quick as I could. Q. You say you pulled out the throttle to give the engine steam? A. Yes, sir. Q. To back up to these cars? A. Yes, sir. Q. That was after you saw Guthrie speaking to these men? A. Yes, sir. Q. After you saw him turn away from them? A. He started right up. Q. When Guthrie turned there, that was the time you pulled the throttle? A. When he gave me the signal to back up, when he threw the switch. Q. You say you saw Guthrie turn away from these men. Which way did he turn,—away from or towards the track? A. Away from them, north. Q. He turned towards the track? A. Not exactly towards the track,—right alongside of the track. Q. He was alongside the track? A. Yes, sir. Q. He was alongside of the track when you say he turned from these men? A. Turned back toward the cars, alongside of the track. Q. When he turned away from these men, he did not turn towards the track? A. No. Q. Started on back towards the cars [the cars for which they were going]? A. Yes, sir. Q. And you saw him after he left the men going towards the cars? A. Yes, sir; towards the cars. Q. When he left the men, and started back towards the cars, you gave some more steam? A. Yes, sir; gave the engine a start,—gave her steam. Q. Gave the engine a start after you saw him leave the men and start back towards the car? A. Yes, sir; I had to reach in like that. Q. You had your hand on the throttle like that? A. I had to reach in to get the throttle. Q. How far did you have to

reach? A. I had to get my head inside, like that. Q. Then you saw him start back towards the cars, and you gave the engine some more steam? A. Yes, sir. Q. Then, after you had done that, what was the next thing that happened? A. I shut her off, and let her run with so much steam, and the next thing I heard was a yell. Q. What did you do then? A. I shut off, and set the air, and reversed her. Q. That was all the work of an instant? A. As quick as I could do it. Q. It didn't take a great while to do it? A. Not a great while."

He also testified that, according to his judgment, the locomotive ran about 35 feet after he heard the yells; also that when the deceased left these men at the crossing the end of the tender was about a couple of car lengths from him.

The testimony of the bystanders at the crossing is to the effect that when the deceased reached the crossing he was running quite fast, but stopped or slowed up for an instant, at a distance estimated at three to four feet from the westerly rail of the track, to inquire of one of their number if the cars were loaded, and then started back again, and just took one step towards the track, and was struck on the shoulder by the corner of the tender, and knocked down; that he fell about ten feet from where he was first struck; that he tried to recover himself two or three times, but that his right foot got on top of the brake beam, or that his feet were caught in some way, and he was shoved along some 15 feet further, and finally fell right across the track, and was run over by the trucks, and killed, at a point about 25 feet from where he was first struck by the corner of the tender. Their evidence is also to the effect that the engine ran from 70 to 90 feet after the corner of the tender struck the deceased. The evidence is that this engine, going at the rate of eight miles an hour, should stop within from 18 to 20 feet after the steam is shut off and the air applied. There is no dispute in the evidence but that the engineer did shut off steam and set the air as soon as he heard the yell, after the deceased was struck.

We think the evidence would have justified the jury in finding that, if the engine had been stopped before the deceased fell across the track, 25 feet from where he was first struck, his life would have been saved. It may also be conceded, for the purposes of this ap-

peal, that the evidence would have justified the jury in finding that the engineer was negligent in not taking reasonable care to protect the deceased brakeman; but this would not entitle the plaintiff to recover, if the deceased himself was guilty of contributory negligence, unless, after discovering him in a place of danger, the engineer was guilty of wanton or wilful negligence in failing to exercise reasonable care to avoid injury.

The court instructed the jury, as a matter of law, that the deceased was guilty of contributory negligence, and that the plaintiff could not recover unless it appeared from the evidence that the engineer, after he saw or knew that the deceased was in a place of danger, could, by the exercise of ordinary care and the use of the appliances under his control, have stopped the engine in time to have avoided the injury. This question the court left to the jury, who rendered a verdict for the plaintiff. We think the court was right in instructing the jury that the deceased was guilty of contributory negligence. While the engineer may owe a brakeman the duty of exercising reasonable care to protect him, yet this does not relieve the brakeman from the duty of exercising reasonable care to protect himself. The deceased was an experienced railroad man, young, and in the full possession of all his senses. He knew the engine was backing up, for he himself had given the signal to do so. It was in broad daylight, and there was nothing, as the evidence shows, to obstruct or prevent his hearing and seeing the approaching engine and tender. The bell was ringing. It is evident, from the testimony of the bystanders, that the tender was almost upon him when he thoughtlessly, unnecessarily, and in apparent oblivion of its proximity, placed himself in a place of danger by stepping too near the track.

The chief contention of the defendant is that there is no evidence that the engineer discovered the deceased in a place of danger in time to prevent the injury; or, in other words, that there is no evidence that the engineer, after discovering the deceased in a place of danger, was guilty of any wanton or wilful negligence by failing to exercise reasonable care to avoid injury. The determination of this question depends largely, if not exclusively, upon the further question, when was the engineer first chargeable with knowledge

of the fact that the deceased was in, or going into, a place of danger? If he was not chargeable with such knowledge until he heard the yells, when the deceased was struck by the tender, then we are satisfied that there is no evidence that he did not do what he ought, in the exercise of reasonable care, to have done, in order to avoid injury. He had no particular reason to expect any signal to stop at that place, as he was still quite a distance from the cars after which he was going. He had turned aside for a temporary purpose, and, under such circumstances, it takes some time (although short) for the faculties to be set in motion and the impulse to act to travel to the muscles.

My own opinion is that, taking the testimony of the bystanders in connection with the admissions of the engineer himself, the evidence would have justified the jury in finding that the engineer knew that the deceased was in, or going into, a place of imminent danger at the time he saw him start to leave the men at the crossing, and that he was negligent in not immediately taking steps to stop the engine, instead of turning round and giving it more steam, for the purpose of increasing its speed. If this is true, I do not think it was a case of mere concurrent negligence, but one where the negligence of the deceased was supervened by the subsequent negligence of the engineer.

But the majority of the court are of the opinion that the evidence would not warrant the jury in finding that the engineer knew, before he heard the yells, that the deceased was in a place of danger, or that before that time the engineer was guilty of such gross or wanton negligence in failing to discover that the deceased was in a place of danger as to be chargeable with bad faith in failing to discover it; that while it is true that, in determining the question of wilfulness or wantonness, the court is not confined to the testimony of the engineer, but should consider all the evidence bearing on the question, yet it should devest itself of all bias resulting from present knowledge of what has since happened, and place itself in the position then occupied by the engineer, who had no means of knowing what was about to happen, except such means and conditions as were then apparent to him; that if the deceased had continued down the track with his back to the engine, and the

engineer, knowing this, had run him down, the case would have been very different, but that as the deceased had turned off the track, stopped, or slowed up, and commenced to talk with the two bystanders, the engineer had good reason to suppose that it was no longer necessary to keep his eye fixed on the deceased for the purpose of protecting him; that this was especially true when the rear of the tender advanced to a point nearly opposite where the deceased stood; that, while the deceased was running with his back to the engine, he knew that it was following him, and had no reason to suppose that it was kept back any more than a safe distance from him, but when he stepped off the track, and stopped, if but for an instant, he was bound to know that it would not be likely to stop, but would continue to approach, and be so near him as to make it especially dangerous for him to step back again upon the track, or so near it as to come in contact with the tender, without looking to see where it was; that the engineer was not guilty of wilfulness or wantonness in failing to know or discover that the deceased at that instant was about to do so dangerous an act as to step back upon or towards the track without even looking; that, while there is a discrepancy between the testimony of the engineer and the bystanders, the court is of opinion that the case cannot be made to turn on this slight discrepancy; that if there were other contradictions in the engineer's testimony, or if it was not otherwise free from suspicion of untruthfulness or improbability, the case might be for the jury, but that the circumstances of the case tend rather strongly to exonerate the engineer from the charge of wilfulness or wantonness; that he had watched the deceased until the latter had stepped off the track, and until the rear of the tender was nearly opposite him, and until it would seem to be an act of madness for the deceased to again step upon, or in dangerous proximity to, the track, without looking in the direction of the engine; that if the engineer had been wanting to put on more steam it was natural that he should, at this juncture, proceed to do so, as he testified he did; that the next instant he heard the yells, and the next proceeded to shut off steam, set the air brakes, and reverse the engine; that there is no inherent improbability in all this, and nothing which tends to prove that the engineer saw or knew

that the deceased had taken a step towards the track before he was struck by the tender, or that the engineer was guilty of wantonness or wilfulness in failing to see the deceased take that step.

These being the views of the majority of the court, the result is that the order appealed from must be reversed, and the cause remanded, with directions to the court below to render judgment for the defendant notwithstanding the verdict.   It is so ordered.